1
2
3
4
5
6
7

8                    **UNITED STATES DISTRICT COURT**

9                   **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   VONDA NORRIS-WILSON, an ABIGAIL            CASE NO. 09CV0916-LAB (RBB)
     PAPA, individually and on behalf of other
12   members of the general public,            **ORDER ON CR0SS-MOTIONS**
                                               **FOR CLASS CERTIFICATION**
13                              Plaintiffs,

14            vs.

15   DELTA-T GROUP, INC., DELTA-T
     GROUP SAN DIEGO, INC., and
16   DELTA-T GROUP LOS ANGELES, INC.,

17                              Defendants.

18

19        Now pending before the Court are cross-motions on class certification, which,

20   naturally, Defendants oppose and Plaintiffs support.  Defendants filed their motion first, on

21   November 19, 2009, and Plaintiffs filed theirs on November 23, 2009.  It's ironic for Plaintiffs

22   to argue that Defendants' "maneuver", as they call it, "gratuitously results in duplicate briefing

23   and leads to an unnecessarily exhausting discussion."  (Doc. No. 44, p. 1.)  "Nothing in the

24   plain language of Rule 23(c)(1)(A) either vests plaintiff with the exclusive right to put the

25   class certification issue before the district court or prohibits a defendant from seeking early

26   resolution of the class certification question."  *Vinole v. Countrywide Home Loans*, 571 F.3d

27   935, 939–40 (9th Cir. 2009).  There's certainly duplicate and excessive briefing in the docket,

28   but Defendants aren't entirely to blame.

Having considered the pleadings and the record, the Court **GRANTS** class certification in part and **DENIES** it in part.

## I.    Introduction

This case is typical as far as employment actions go.  Plaintiffs allege that Delta-T Group ("DTG") "willfully and maliciously" classified them as "independent contractors" in order to avoid treating them like the employees they are.  (Compl. ¶ 1.)  The difference, of course, is that under California law employees are entitled to things that independent contractors aren't: overtime pay, meal and rest breaks, comprehensive wage statements, and reimbursement of business-related expenses.  The essence of Plaintiffs' complaint is that they were wrongfully denied each of these.  They allege six claims, five arising under the California Labor Code and one, for unfair competition, arising under the California Business and Professions Code.

## II.    Factual Background

DTG is in the behavioral healthcare business.  Its "good" — to pick a neutral word — is healthcare professionals: psychiatrists, psychologists, nurses, counselors, child and family therapists, special educators, and the like.  Its clients are institutions that require the work of those professionals: outpatient clinics, hospitals, psychiatric inpatient facilities, residential treatment facilities, individual family homes, community centers, long-term care facilities, shelters, drug and alcohol treatment facilities, schools, foster care homes, child care centers, adult day care centers, and independent living centers.  This much the parties can agree on.

So how exactly to describe the relationship between DTG, the healthcare professionals, and DTG's clients?  That's where the parties' disagree and apply their own spin to the facts.  DTG calls itself a "referral agency for independent contractor services" — a "broker" that "bring[s] together independent behavioral healthcare professionals with clients who need their services."  (Doc. No. 34-1, p.3.)  Plaintiffs, on the other hand, call DTG "a temporary staffing agency, supplying temporary staffing relief to the mental and behavioral healthcare industry."  (Doc. No. 36-1, p. 3.)  Plaintiffs also insinuate that DTG *knows* it's a staffing agency and goes to "great pains" not to sound like one.  (*Id.* at p. 3 n. 1.)  For

example, an internal DTG training manual, under the heading "Do's and Don'ts," says,

> DTG provides Independent Contractors not employees. Therefore, we must use the correct terminology when speaking to our customers. We have to be mindful of words that would imply we have an employer/employee relationship with our professionals for legal and liability reasons.

(Doc. No. 36-2, Ex. X, DT 7589.) It goes on to advise using the words: "Referral Service" not "Employer"; "Independent Contractor" not "Employee"; "Assignment/Contract/Opportunity" not "Position/Job"; "Retain Services" not "Hired"; "Contracted" not "Worked"; "Invoice" not "Timecard"; "Compensated" not "Paid." (*Id.* at DT 7590–91.)  In Plaintiffs' eyes this is evidence of a guilty conscience.

## III.    Legal Standard - Class Certification

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure, and it's appropriate when each of the four requirements of Rule 23(a), and one requirement of Rule 23(b), have been met. *Dukes v. Wal-mart, Inc.*, 509 F.3d 1168, 1176 (9th Cir. 2007). The four requirements of Rule 23(a) are: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."   Fed. R. Civ. P. 23(a).   These are commonly referred to as the numerosity, commonality, typicality, and adequacy requirements. The three requirements of Rule 23(b) are:

> (1)    prosecuting separate actions by or against individual class members would create a risk of:
>
> (A)    inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>
> (B)    adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> (2)    the party opposing the class has acted or refused to act

09CV0916

1
2

> on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

3
4
5

> (3)  the court finds that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

6  Fed. R. Civ. P. 23(b).  It is on the basis of Rule 23(b)(3) that Plaintiffs seek class certification

7  in this case.

8       Plaintiffs bear the burden of showing that these requirements are met and that class

9  certification is warranted.  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th

10 Cir. 2001).   The burden isn't shifted simply because Defendants moved to deny class

11 certification first.  *Kimoto v. McDonald's Corps.*, No. CV 06-3032, 2008 WL 4690536 at *3

12 (C.D. Cal. Aug. 19, 2008).  The burden, however, is slight, as "a court need only be able to

13 make a reasonable judgment that Rule 23 requirements are satisfied."  *Marlo v. United*

14 *Parcel Serv. Inc.*, 251 F.R.D. 476, 487 (C.D. Cal. 2008).  Ultimately, it is within the discretion

15 of the Court whether to certify a class.  *United Steel , Paper & Forestry, Rubber, Mfg.*

16 *Energy, Allied Indus. & Service Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips* Co.,

17 593 F.3d 802, 807 (9th Cir. 2010).

18      The underlying merits of a case shouldn't cloud the class certification analysis.  The

19 question is only whether the requirements of Rule 23 are met.  *Eisen v. Carlisle & Jacquelin*,

20 417 U.S. 156, 177–78 (1974).  "[N]either the possibility that a plaintiff will be unable to prove

21 his allegations, nor the possibility that the later course of the suit might unforeseeably prove

22 the original decision to certify the class wrong, is a basis for declining to certify a class which

23 apparently satisfies the Rule."  *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975).

24      Finally, although it is no license to approach the class certification question with

25 insouciance, Rule 23 further provides that "[a]n order that grants or denies class certification

26 may be altered or amended before final judgment."  Fed. R. Civ. P. 23(c)(1)(C).  The Court's

27 decision whether to certify Plaintiffs' case as a class action is therefore "inherently tentative."

28 *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n.11 (1978).  "Even after a certification

order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982); *see also United Steel*, 593 F.3d at 809 (district court "retains the flexibility to address problems with a certified class as they arise, including the ability to decertify").

## IV.    Legal Background - California Labor Law

As Plaintiffs put it, "all causes of action rest on resolution of a single common issue: whether Defendants' temporary workforce operate as employees or independent contractors under the law." (Doc. No. 36-1, p. 9.)

Under California law, "the principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired . . . ." *S.G. Borello & Sons, Inc. v. Dep't of Industrial Relations*, 48 Cal.3d 341, 350 (1989) (quoting *Tieburg v. Unemployment Ins. App. Bd.*, 2 Cal. 3d 943, 946 (1970)) (internal quotations omitted).  There are also "secondary indicia of the nature of a service relationship," including whether an alleged employer has the right to discharge at will and without cause.  *Id.* at 350–51.  Additional factors that have been derived principally from the Restatement Second of Agency include:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

(*Id.* at 351.)

## V.    Discussion

DTG denies that Plaintiffs can satisfy the commonality, typicality, and adequacy requirements of Rule 23(a), as well as the superiority requirement of Rule 23(b)(3).  It concedes, as it should, that Plaintiffs *can* satisfy the numerosity requirement of Rule 23(a).

//

09CV0916

1   Because the failure to satisfy any one requirement is fatal to class certification, the Court will
2   consider them in sequence.

3       **A.      Arguments on the Merits**

4       First, however, it's worth observing that neither party, in briefing the class certification
5   question, can help itself from making arguments that go to the underlying merits of this case.
6   This is especially detrimental to DTG's cause because it implicates the company in a kind
7   of contradiction: They argue that Plaintiffs are truly independent contractors — a merits
8   argument — and at the same time that individual issues predominate and a class-wide
9   determination of Plaintiffs' proper job classification is impossible.  It's hard to see how both
10  things could be true.  "Defendant cannot, on the one hand, argue that all reporters and
11  account executives are exempt from overtime wages and, on the other hand, argue that the
12  Court must inquire into the job duties of each reporter and account executive in order to
13  determine whether that individual is exempt." *Wang v. Chinese Daily News*, 231 F.R.D. 602,
14  613 (C.D. Cal. 2005).  Now, it may be that DTG believes its workers are in fact independent
15  contractors *for reasons unique to each individual*, but it's more likely the case the DTG
16  believes the independent contractor classification is universally appropriate.  That runs at
17  cross-purposes with the reason for objecting to class certification, which is that it's
18  impossible to reach general conclusions about the putative class as a whole.

19      DTG's moving memo starts out on the right note: "Individual questions of fact and law
20  clearly predominate in this case because it will be necessary to undertake an individual
21  examination of each class member under the multi-factored, fact-intensive independent
22  contractor test."  (Doc. No. 34-1, p. 2.)  But the "Statement of Facts" that follows reads as
23  though it's right out of a summary judgment brief.

24      For example, DTG describes the relationship between it and healthcare professionals
25  in a manner intended to justify the independent contractor classification:

26          Defendants serve as referral agencies in the behavioral
            healthcare industry.  This process entails: (I) DSD or DLA
27          receives a request from a client regarding the need for certain
            behavioral healthcare services; (ii) searches its registry for
28          qualified professionals; (iii) the opportunity is offered to one or
            more qualified professionals; (iv) the professional is free to

- 6 -

1
2
3
4
5

accept or reject the offer; (v) if the professional accepts the offer, he or she is put into contact with the client; (vi) the professional and client then determine the schedule, scope of responsibilities, and length of contract; (vii) the professional provides services to the client at the client's facility or at the homes of individual consumers; and (viii) the professional submits an invoice to DSD or DLA documenting the services provided, and based on the invoice, the client is billed and a compensation check is provided to the professional.

6    (*Id.* at pp. 3–4.)

7    It insists that named Plaintiffs Norris-Wilson and Papa weren't provided with training,

8    assigned tasks, held to schedules, or required to submit assignments — all indicia of one's

9    status as an employee.  (*Id.* at p. 4.)

10    It explains that the use of independent contractors in the behavioral healthcare

11    industry is both appropriate and widespread.  (*Id.*)

12    It explains that "[e]ach professional registering with Defendant must enter into an

13    agreement explaining, and consenting to, the professional's status as an independent

14    contractor." (*Id.* at p. 5.)  It continues: "[T]he testimony of Plaintiffs and other professionals

15    demonstrates that the realities of their relationship with Defendants reflect these contractual

16    provisions."  (*Id.*)

17    It argues that "Defendants did not supervise or control how professionals provide their

18    services to clients . . . a critical factor that distinguishes referral agencies, such as

19    Defendants, from employment firms or leasing agencies." (*Id.* at p. 10.)  Here, DTG makes

20    sweeping claims with respect to the putative class as a whole, which obviously undercuts its

21    argument that such claims are impossible because individual issues predominate.

22    •    Defendants did not establish the hours, duties, or responsibilities for a referral.
23    •    Defendants did not supervise professionals day-to-day services.
24    •    Professionals had infrequent communications with Defendants.
25    •    Defendants did not train professionals in how to perform their services for clients.
26    •    Professionals were free to accept or reject referrals opportunities, and free to do any outside work at the same time they were registered through Delta-T.
27
28    •    If a professional accepts a referral opportunity presented by Delta-T, he or she performs the professional services at the client facility or other location specified by the

09CV0916

> client; the professional never performs any services on Delta-T's premises.

(*Id.* at p. 10.)

It says, "The evidence demonstrates that a great number of these professionals satisfy all applicable standards for independent contractor status." (*Id.* at p. 12.)

It says, "The professionals attest to the fact that Defendants do not supervise or direct the manner and method of their work. In fact, Defendants are not qualified to supervise professionals in the performance of their services." (*Id.* at p. 19.)

It says, "Defendants did not provide its professionals with educational programs or training. Professionals invest in their own education and marketability by investing their own funds in their professional education, training, and licensure." (*Id.* at 20.)

It says, "A common and resounding theme from every single declarant, as well as Plaintiffs' own testimony, is that Defendants do not supervise or oversee their work, do not give them clinical direction, and do not provide day-to-day guidance." (*Id.*)

It says, "The record shows that the professionals understand that they are independent contractors and they understand the benefits and drawbacks of this classification." (*Id.* at 21.)

And then there is the expert report of Dr. Ali Saad, which, though it purports to explore the similarities and differences in the work circumstances of members of the putative class, is overwhelmingly a brief on the merits of Plaintiffs' case. One would expect Saad to say there is too much variation among the members of the putative class to allow for a class-wide determination of the independent contractor question, but he proceeds to reach a number of sweeping conclusions that imply the exact opposite. He notes, "[F]rom the labor economics standpoint, there are no indicia that I can discern for the contractors I studied that would place them into the category one typically sees for employees." (Doc. No. 34-5, p. 3.) He looked at the manner in which Delta T's workers compete for opportunities and concluded, "These are certainly not the features of a regular employment relationship." (*Id.* at p. 10.) He considered their work schedules and concluded they were "another reason why the Delta-T California contractors do not fit the notion of 'employees.'" (*Id.* at p. 11–12.)

He says, "There is little evidence in the data that *any one* of the contractors consistently serviced referrals for a fixed number of hours per week. This pattern is again inconsistent with the typical notion of an 'employee' . . . ." (*Id.* at p. 13) (emphasis added). He explains that "the most important economic feature present in typical employee populations are methods to measure productivity," but that he'd been told Delta-T has no performance evaluation process. (*Id.* at p. 20–21.) Here again, if the goal is to show that the employee-versus-independent-contractor question cannot be resolved on a class-wide basis, one would expect Saad to testify that the variables informing the answer are all over the place, not that they come out in favor of the independent contractor classification that DTG has chosen.

DTG must understand that this sends mixed signals to the Court. On the one hand, it's DTG's position that individual issues predominate such that it's impossible to speak broadly about whether members of the putative class either are or aren't independent contractors. But then DTG doesn't hesitate to do just that by standing up, over and over again in its brief and supporting exhibits, for the classification it has chosen. The putative class numbers 1,200. (*Id.* at 19.) It can't be that DTG believes they are *all* independent contractors because it has considered the circumstances of each; it offers this proposition, rather, with reference to common, universal facts.

This is what happens when issues are overbriefed. Parties stray from the arguments that they should be making. The better arguments lose focus. It can't be true that Plaintiffs are categorically "independent contractors" (the merits argument) *and* that it would take an individual-by-individual analysis to make that determination (the class certification argument).

## B.   Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality focuses on the relationship of common facts and legal issues among class members." *Dukes*, 509 F.3d at 1177. "All questions of fact and law need not be common to satisfy the rule." *Id.* (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)). Indeed, "one significant issue common to the class may be

1    sufficient to warrant certification." *Id.* Commonality presents only a "minimal" bar to class

2    certification. *Hanlon*, 150 F.3d at 1020.

3        DTG's argument that Plaintiffs fail to satisfy the commonality requirement of Rule

4    23(a) ignores the fact that the requirement is a permissive one. *Id.* at 1019. This Court has

5    previously held that whether workers are properly classified as employees or independent

6    contractors is, by itself, a factual and legal issue that satisfies Rule 23(a). *See, e.g.*, *Soto*

7    *v. Diakon Logistics, Inc.*, No. 08-CV-33, 2010 WL 3420779 at *2 (S.D. Cal. Aug. 30, 2010).

8    Here, all members of the putative class were hired by DTG and classified as independent

9    contractors pursuant to the same "IC Agreement." Moreover, the merits of that classification

10   turn on the same set of considerations. This is enough to satisfy the commonality

11   requirement.

12       DTG's short and conclusory argument to the contrary — basically, that the exact

13   same factual considerations must be outcome-determinative with respect to each individual

14   plaintiff's claims — would impose a more stringent commonality requirement than is

15   warranted. (*See* Doc. No. 34-1, p. 12–13.) Really, DTG is making a point about the

16   predominance of common questions  under Rule 23(b)(3) rather than the mere presence of

17   them under 23(a)(2). The Court will get to that.

18       **C.   Typicality**

19       The typicality inquiry under Rule 23(a)(3), also a permissive one, requires that "the

20   claims or defenses of the representative parties are typical of the claims or defenses of the

21   class." Fed. R. Civ. P. 23(a)(3). The representative claims don't need to be "substantially

22   identical" to those of absent class members, just "reasonably coextensive." *Dukes*, 509 F.3d

23   at 1184 (citing *Hanlon*, 150 F.3d at 1020). To be sure, "[s]ome degree of individuality is to

24   be expected in all cases, but that specificity does not necessarily defeat typicality." *Dukes*,

25   509 F.3d at 1184.

26       DTG doesn't address typicality head-on in its main brief, choosing instead to blur it

27   into a discussion of whether the commonality requirement is satisfied. (Doc. No. 34-1, p.

28   12.) But it's hard to see how this requirement *isn't* met. "The test of typicality is whether

other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). The entire class alleges an identical injury, namely that they were wrongfully classified as independent contractors by DTG and, as a result, denied a panoply of work-related benefits that are afforded to employees under California labor laws. The injuries alleged — a denial of various benefits — and the alleged source of those injuries — a sinister classification by an employer attempting to evade its obligations under labor laws — are the same for all members of the putative class. DTG has no real rebuttal to this. The typicality requirement is therefore satisfied.

### D.   Adequacy

Rule 23(a)(4) permits certification of a class only if the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This factor requires: "(1) that the proposed representative Plaintiffs do not have conflicts of interest with the proposed class, and (2) that Plaintiffs are represented by qualified and competent counsel." *Dukes*, 603 F.3d at 614 (citing *Hanlon*, 150 F.3d at 1020).

We can get the easy prong out of the way. DTG doesn't question whether Plaintiffs are represented by qualified and competent counsel, and it's obvious that they are. Plaintiffs' are represented by a national law firm, Nichols Kaster, that specializes in employment and class action law.

But are there other reasons to find that the named Plaintiffs, Norris-Wilson and Papa, are inadequate representatives for the putative class? DTG offers four.

First, DTG argues that Plaintiffs are inadequate because "they have weak to non-existent claims," and it asks the Court to consider the record and legal arguments set out in a motion for summary judgment that it filed a full month before moving to deny class certification. (*See* Doc. No. 34-1, p. 14 and Doc. No. 30.) The Court has already decided that DTG's summary judgment motion was premature, and it has put off consideration of it, sensibly, until the class certification question is resolved. (Doc. No. 38.) DTG's reliance on

*Robinson v. Sheriff of Cook County*, 167 F.3d 1155 (7th Cir. 1999) is misplaced (even if the opinion is a Posner original and characteristically sharp).  That case dealt with a named plaintiff whose claims were *particularly* deficient — in fact, they had been dismissed — and who was attempting to represent a class of people with potentially plausible claims.  That is the context for the statement, quoted by DTG, "One whose claim is a loser from the start knows that he has nothing to gain from the victory of the class, and so he has little incentive to assist or cooperate in the litigation; the case is then a pure class action lawyer's suit." *Id.* at 1157.  Anyway, the claims of Norris-Wilson and Papa in this case are not clear losers. The most that can fairly be said at this stage in the litigation is that the claims may ultimately fail, but that's almost always going to be the case, and as Judge Posner recognized in *Robinson*, "The point is not that a plaintiff is disqualified as class representative if he *may* fail to prove his case or if the defendant *may* have good defenses." *Id.* at 1158.  The adequacy prong of Rule 23(a) isn't the place to try to litigate the merits of a case.   In fact, "nothing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *United Steel*, 593 F.3d at 808 (alterations in original) (quoting *Eisen*, 417 U.S. at 177–78).

DTG's second argument is that the named Plaintiffs dealt exclusively with Delta-T Group's San Diego affiliate, and therefore aren't qualified to represent a *California* class that includes those who dealt with Delta-T Group's Los Angeles affiliate. (Doc. No. 34-1, p. 14.) DTG fails to develop this argument and explain how the San Diego and L.A. affiliates actually differ, which confirms that the Court should take the argument only half-seriously. Employment-related class actions proceed against companies with a national presence all of the time, and that presumes it's possible to generalize about a company's employees across branch locations.

Third, DTG argues that Norris-Wilson and Papa "are themselves significantly different" such that "[t]he facts and circumstances that Plaintiffs would use to challenge their independent contractor classification would not be the same facts that professionals

performing different jobs or different responsibilities would argue." (Doc. No. 34-1, p. 15.) This doesn't go to adequacy as much as the concern for commonality under Rule 23(a) that the Court has already addressed, as well as the concern for predominance and superiority under Rule 23(b)(3) that the Court will address.

DTG's last argument is that many behavioral healthcare professionals who work with DTG *prefer* to be independent contractors, and that this creates a conflict of interest. (Doc. No. 34-1, p. 15.) But the conflicts that Rule 23(a)(4) is concerned about are conflicts between the class representatives and other members of the putative class, not between those who do and don't think a lawsuit is a good idea in the first place. Just because potential class members disagree with the spirit of an action doesn't mean it shouldn't be certified. *See Smith v. Cardinal Logistics Mgmt. Corp.*, No. 07-2104, 2008 WL 4156364 at *7 (N.D. Cal. Sept. 5, 2008). It will almost always be the case that some putative class members are happy with things as they are. DTG's reliance on *O'Neal v. Riceland Foods*, 684 F.2d 577 (8th Cir. 1982), is improper. Class certification was denied in that case because the plaintiff brought a wrongful termination claim against her employer and sought to represent a class of people with failure-to-hire claims — a clear disconnect not present in this case. *Id.* at 581 n. 2.

All of DTG's arguments impugning the adequacy of Norris-Wilson and Papa as class representatives are off-base. The Court finds the adequacy requirement of Rule 23(a)(4) is satisfied.

### E. Predominance

Having concluded that the putative class action meets the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a), the tracks of the analysis now lead to Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). First, predominance.

//

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchen Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). One virtue of class certification, where it is appropriate, is that it serves judicial economy, and "the notion that the adjudication of common issues will help achieve judicial economy is an integral part of the predominance test." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 958 (9th Cir. 2009) (internal quotations and citations omitted). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001).

There are two separate inquiries here. The first is if the threshold question — whether putative class members are employees or independent contractors — passes the predominance test. If it doesn't, there's no need to press on; class certification should be denied. And if it does, there's a second question: Do the Plaintiffs' individual claims pass the predominance test, or will those claims invite separate analyses for putative class members?

### 1.    Employee or Independent Contractor?

The question here is if the factors to be considered in determining whether a worker is an employee or independent contractor are susceptible to common proof. It isn't enough to show that the members of the putative class differ in various ways, because those differences may not inform that question. For example, DTG presents statistical evidence that members of the putative class have "highly diverse educational levels." (Doc. No. 34-1, p. 7.; Doc. No. 34-5, Ex. C-2.) But it's unclear how this relates to DTG's right to control their work, or its right to discharge them at will, or any of the other relevant factors for determining whether an employer-employee relationship exists. At best, one's level of education is a rough proxy for the level of skill their work requires, but this is only one of several secondary factors in the analysis. Likewise, the fact that "compensation arrangements vary widely"

among members of the putative class doesn't inform the question at issue.  (Doc. No. 34-1, p. 7.)  That is to say, it's hard to see how one's status as an employee or independent contractor could turn on whether he or she makes $24.50 an hour, $10.46 an hour, or $107.50 an hour.  (*Id.*)

DTG seems to argue that whether a worker is an employee or independent contractor is inherently a fact-intensive, individualized question.  (Doc. No. 34-1, p. 17-18.)  But just because the *test* for making the determination takes into account a multitude of factors doesn't mean it's not susceptible to common proof.  If that were true, these cases would never be certified.  And yet they routinely are.  *E.g.*, *Dalton v. Lee Publ'ns*, No. 08-CV-1072, 2010 WL 2985130 (S.D. Cal. July 27, 2010); *Phelps v. 3PD, Inc.*, 261 F.R.D. 548 (D. Or. 2009); *Chun-Hoon v. McKee Foods Corp.*, No. C-05-620, 2006 WL 3093764 (N.D. Cal. Oct. 31, 2006).

As the Court has already noted, the defining feature of the employer-employee relationship is the employer's right to control the work of the employee.  *Borello & Sons*, 48 Cal.3d at 350.  Is that question susceptible to common proof in this case?  Can the question be answered definitively for the putative class as a whole, or only with respect to individuals because the circumstances of their work vary so greatly from one to the other?  The Court finds no evidence in the record to suggest that the members of the putative class received such varying levels of supervision that it's impossible to adjudicate this issue with respect to the class as a whole.

To the contrary, it's quite clearly DTG's position that they received the same amount of supervision — none — and that it's possible to reach this conclusion by considering common proof.  Just consider the following statements.  "The professionals attest to the fact that Defendants do not supervise or direct the manner and method of their work."  (Doc. No. 34-1, p. 19.)  "Professionals do not require the direction of Defendants, but rather use their own skill and judgment, based on professional experience and education, when providing their services."  (Doc. No. 34-1, p. 19-20.)  "[B]oth the IC Agreements, as well as common sense, dictate that Defendants cannot direct the way in which healthcare workers are

providing their services . . . A common and resounding theme from *every single declarant*, as well as Plaintiffs' own testimony, is that Defendants do not supervise or oversee their work, do not give them clinical direction, and do not provide day-to-day guidance." (Doc. No. 34-1, p. 20 (emphasis added).)  It's only possible to make statements like this if it's possible to generalize across members of the putative class, which is precisely the position that DTG should be *contesting* for the purposes of opposing class certification in this case.

The declaration of Ali Saad points explicitly to common proof of the healthcare workers' appropriate classification.  It is his "understanding," he says in his declaration, "that Delta-T does not provide any supervision of the actual services of the contractors who take on referrals, and that it provides no performance evaluations to its contractors." (Doc. No. 34-5, p. 9.)  It would be very different if DTG actually supervised some workers and not others, or supervised them all but in vary degrees.  Likewise, it would be very different if DTG evaluated some workers and not others, or evaluated them all but in different ways.  Then the Court would see the difficulty in trying to adjudicate the workers' proper classification with respect to the putative class as a whole.  *See Wells Fargo*, 571 F.3d at 959 (class certification inappropriate when "fact-intensive inquiry into each potential plaintiff's employment situation" is required).  But the parameters of the relationship between DTG and the members of the putative class are spelled out in the same contract, and there is no apparent need to look at each putative class member to make an independent, factual finding as to whether his or her work was controlled by DTG, and if so to what degree.  *See Dalton*, 2010 WL 2985130 at *6 (right to control susceptible to common proof because rights and obligations of class workers were set forth in identical contracts).

None of this is to say that the putative class members are similarly situated in all respects.  They're not.  The do vary in a multitude of ways.  But the question is whether those variations — in the number of "referrals" they received from DTG, in the number of hours per day and days per week they worked, in the nature of the work they performed, in their educational backgrounds, in the certifications and licenses they carry — are meaningful when it comes to answering the question whether they are independent contractors or

09CV0916

employees of DTG.  The Court doesn't believe they are.  At best, they touch on just three of the seven secondary factors articulated in *Borello and Sons*: (1) the kind of occupation; (2) the skill required in the particular occupation, and (3) the length of time for which the services are to be performed.  *Borello & Sons*, 48 Cal.3d at 351.  But the remaining secondary factors are more than likely susceptible to common proof: (1) whether the one performing the services is engaged in a distinct occupation; (2) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (3) the method of payment, whether by time or by the job; (4) whether or not the work is a part of the regular business of the principal; and (5) whether or not the parties believe they are creating the relationship of employer-employee.  *Id.*

Because the degree of DTG's control over the workers is susceptible to common proof, and because the same can be said of a good number of the secondary factors that define an employment relationship, the Court finds that common issues predominate over individual ones with respect to the threshold question whether putative class members are employee of DTG or independent contractors.

It's still left to determine whether the same can be said of the putative class's individual claims.  The question here isn't whether *damages* are susceptible to common proof.  They don't have to be.  *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975).  The question is whether, assuming members of the putative class are employees of DTG, the fact that they were denied the benefits of actual employment can be adjudicated either on a class-wide basis, with minimal analysis of each class member's employment history.

## 2. Overtime Compensation

DTG argues that the putative class's first cause of action can't be resolved on a class-wide basis because not all members logged overtime hours during the class period.  It's certainly true that some class members don't have claims for overtime compensation.  The Saad declaration explains, "For the nearly 4,800 contractor-weeks studied between 2005 and 2009 for the 200 randomly chosen contractors, 89% of them showed contractors providing fewer than 40 hours of service in a given week. " (Doc. No. 34-5, p. 8.)  He also

notes that "[t]he average amount of time spent by contractors servicing referrals in a single day was less than eight hours." (*Id.*)  But is certification therefore a bad idea?  The Court doesn't believe so.  DTG obviously has records of the hours the putative class members logged at their respective locations, and determining whether any one member logged overtime hours is a matter of basic computation.  The individual analyses required are minor, and do not defeat certification.  *See Dalton*, 2010 WL 2985130 at *7–8.  Indeed, once the matter of liability has been resolved, the question of damages almost answers itself.  That means it's possible to conceive of the liability question as a straightforward damages question, anyway, in which case the Court follows the principle announced in *Blackie* that individual analysis is to be expected but doesn't defeat class action treatment.  *Blackie*, 524 F.2d 891.  The first claim can therefore be certified for adjudication on a class-wide basis.

### 3.    Meal and Rest Periods

The Court reaches a very different conclusion with respect to meal and rest period that, allegedly, weren't provided to members of the putative class.  Plaintiffs argue that the issue allows for a relatively painless class-wide adjudication: "Defendants do not provide meal or rest breaks, and they do not pay temporary workers a premium when their invoice reveals that breaks were not taken.  This claim can also be adjudicated through a swift review of timesheets to determine who missed breaks and when."  (Doc. No. 44, p. 22.)

It isn't so simple.  As the Court has previously explained, "Recent, published opinions from district courts in California have denied class certification on meal period/rest break claims where the defendant did not have a uniform policy on these matters."  *Ruiz v. Affinity Logistics Corp.*, No. 05-CV-2125, 2009 WL 648973 at *6 (S.D. Cal. Jan. 29, 2009) (citing *Brown v. Fed. Ex. Corp.*, 249 F.R.D. 580 (C.D. Cal. 2008); *Kenny v. Supercuts, Inc.*, 252 F.R.D. 641 (N.D. Cal. 2008); and *Blackwell v. SkyWest Airlines, Inc.*, 245 F.R.D. 453 (S.D. Cal. 2007)).  *Brown* is an instructive case.  The putative plaintiffs were Fed-Ex drivers, and the court refused to certify a class with meal and rest break claims because the drivers were dispersed across many different facilities, drove different routes, were subjected to different levels of monitoring, had different delivery duties, and were busy at different times

throughout the day.  *Brown*, 249 F.R.D. at 586–87.  "Faced with this variance," the court explained, "Plaintiffs propose no method of common proof that would establish that FedEx's policies prevent drivers from taking required breaks, regardless of their individual circumstances."  *Id.* at 587.

This case presents a similar problem.  The healthcare professionals aren't employed at a single location managed by DTG, where they are subject to a uniform meal and rest break policy; they're employed at a range of client sites, performing a range of duties, under a range of circumstances.  The claim to the contrary, namely that the putative class members' entitlement to meal and rest breaks is a simple matter of timesheet accounting, ignores that.  It also ignores overwhelming case precedent for the rule that, under the applicable California statute, meal and rest breaks need only be *made available* to employees, not actually taken.  *Salazar v. Avis Budget Group, Inc.*, 251 F.R.D. 529, 532–33 (S.D. Cal. 2008) (citing *White v. Starbucks*, 497 F.Supp.2d 1080 (N.D. Cal. 2007)).  Timesheets, therefore, don't really inform the issue.

The Court finds that common question don't predominate on the meal and rest break claims.  They are ill-suited for class-wide adjudication.

### 4.    Wage Statements

California labor law obliges employers to provide all employees "an accurate itemized statement in writing" showing , among other things, "gross wages earned" and "total hours worked by the employee" during the pay period. Cal. Labor Code § 226(a).  It's likely that this claim has been tacked onto the complaint for the technical reason that a violation of § 226(a) would follow naturally from a failure to pay overtime wages.  If an hour of actual overtime counts as an hour and a half of work, and for an hour and a half of pay, then inevitably the wage statements will be off for those who logged overtime hours but weren't compensated for them.  For the same reasons that claims for overtime pay can be adjudicated on a class-wide basis, then, claims alleging inadequate wage statements can also be so adjudicated.  *See Adoma v. University of Phoenix, Inc.*, No. S-10-0059, 2010 WL 3431804 at *9 (E.D. Cal. Aug. 31, 2010) (certifying wage statement claim for class treatment

1   because unpaid overtime claim was amenable to class treatment).   No additional,
2   independent investigation is required.

3       But it is only in this limited, technical scope that the Court believes wage statements
4   claims are amenable to class treatment.  Any wage statement claims that involve a dispute
5   about the *actual* number of hours a putative class member worked will require a focused
6   investigation of that person's work history, and therefore aren't amenable to class treatment.

7                    **5.     Failure to Indemnify Expenses**

8       "An employer shall indemnify his or her employee for all necessary expenditures or
9   losses incurred by the employee in direct consequence of the discharge of his or her duties."
10  Cal. Labor Code § 2802.  The complaint alleges that DTG failed to comply: "Plaintiffs and
11  Class Members routinely incurred necessary expenditures or losses in their travels to, from,
12  and between client-sites, running errands for Defendants' clients, transporting Defendants'
13  clients' patients, and for other costs incurred in obedience to Defendants' and their clients'
14  duties. " (Compl. ¶ 69.)  DTG argues that this claim begs for individual inquires, which isn't
15  a bad argument considering that whether an expense is necessary "is a fact-intensive
16  'inquiry into what was reasonable under the circumstances.'" *Ruiz*, 2009 WL 648973 at *7
17  (quoting *Grissom v. Vons Cos. Inc.*, 1 Cal.App.4th 52, 58 (Cal. Ct. App. 1991)).

18      If there were a single expense, or a set of discrete expenses, common to the entire
19  putative class, and that class members were required to cover themselves, the Court would
20  see the merits in class treatment.  *See, e.g.*, *Stuart v. Radioshack Corp.*, No. C-07-4499,
21  2009 WL 281941  (N.D. Cal. Feb. 5, 2010) (certifying class of employees who weren't
22  reimbursed for driving their own cars to perform inter-company store transfers of
23  merchandise).  But the putative class here includes a range of behavioral healthcare
24  professionals who worked at a range of client sites performing a wide range of services.   It
25  is hard to see how the expenses they incurred in the process could be ascertained in one
26  fell swoop, or even several fell swoops.  The question necessarily requires a worker-by-
27  worker, highly individual analysis.  It isn't even clear that expenses "were in the same
28  ballpark across the class." *Ruiz*, 2009 WL 648973 at *8.

Plaintiffs note that "Defendants concede that they make deductions to workers' compensation for certifications, background checks, medical exams, fines, and insurance," and they argue that "damages can be computed through a review of payroll and check stubs." (Doc. No. 44, p. 22–23.)  Not only does the Court doubt that this computation is as simple as Plaintiffs want to make it seem, given the size and diversity of the putative class, but the complaint does not limit the expenses for which Plaintiffs seek reimbursement to such a definite and identifiable list.  Rather, it references travel to, from, and between client sites, errand running, and "other costs incurred in obedience to Defendants' and their clients' duties." (Compl. ¶ 69.)  Such an expansive and varied list of expenditures for which Plaintiffs seek reimbursement is not suitable for class treatment.

### 6. Waiting Time Penalties

The last of Plaintiffs' claims under the California Labor Code seeks "waiting time penalties" for DTG's failure to pay wages on time. (*See* Compl. ¶¶ 46–51.)  This is actually the second claim in the complaint, but the Court addresses it last because it appears to have escaped the parties' briefing.  In its motion opposing class certification, DTG devotes particular attention to Plaintiff's overtime, meal and rest break, reimbursement, and wage statement claims, but it never addresses the waiting time claim head-on. (*See* Doc. No. 34-1, pp. 21–23.)  Likewise, under the "Factual Background" section of the complaint Plaintiffs skip the waiting time penalties when they list the facts giving rise to their various claims under the California Labor Code. (*See* Compl. ¶¶ 22–25.)

As pleaded, the waiting time penalties Plaintiffs seek leave the Court somewhat confused.  The cause of action arises, allegedly, under sections 201, 201.3, and 202 of the California Labor Code.  Section 201 requires that discharged employees receive any earned and unpaid wages immediately.  Cal. Labor Code § 201.  (This applies to temporary workers who are discharged, too, under section 201.3(b)(4).)  Section 201.3 requires that temporary workers be paid at least weekly, or daily if they are assigned to work for a client on a day-to-day basis and certain conditions are met.  Cal. Labor Code § 201.3(b)(1)-(2).  Section 202 requires that employees who don't have a written contract to work for a definite period, and

who quit, are entitled to earned and unpaid wages within a 72-hour period, unless they've given 72 hours of notice, in which case their wages are due immediately.  Cal. Labor Code § 202.  (Under Cal. Labor Code § 201.3(b)(5), this applies also to temporary workers.)

These statutory provisions say other things, but the Court assumes that Plaintiffs rely on them for the portions just described: The members of the putative class, who are temporary workers, weren't paid immediately if and when they were fired, weren't paid weekly (or daily, if they worked for a client on a day-to-day basis), and weren't paid within 72 hours if and when they quit — or immediately if they gave 72 hours of notice that they would quit.  Section 203 of the California Labor Code speaks to damages.  It provides that the failure to pay wages on time to an employee who quits or is discharged may be penalized with the continued payment of wages "until paid or until an action therefor is commenced," but not for a period to exceed 30 days.  Cal. Labor Code §203.  The section doesn't appear to specify damages for violating that part of section 201.3 that requires temporary workers to be paid either weekly or daily, depending on their arrangement, but the complaint is clear that Plaintiffs seek damages only for DTG not timely paying those who employment ended during the class period.  (Compl. ¶ 51.)

The Court has the same view of Plaintiffs' waiting time claims as it does of their overtime claims.  If it turns out that members of the putative class *are* employees of DTG rather than independent contractors, it won't require anything other than basic computation to determine if they're entitled to damages for not being paid on time once their employment ended.  This issue is therefore appropriate for class treatment.

### 7.    Unfair Competition

Plaintiffs' final claim arises under the California Business and Professions Code, and it is wholly derivative of their other claims.  Because the Court has found that some of those claims can be resolved on a class-wide basis — the overtime compensation claim, for example — the unfair business practices claim can also be so resolved.  *See Ruiz*, 2009 WL 648973 at *8 (class-wide adjudication of unfair business practices claim turns on adjudicability of underlying causes of action).

**B.    Superiority**

The Court has concluded that the threshold question whether DTG's healthcare professionals are employees or independent contractors is appropriate for class-wide adjudication, as are Plaintiffs' related claims for overtime pay, inadequate wage statements, and the failure to cut paychecks in time upon the termination of employment.  With respect to each of these claims, it's the Court's view that common issues predominate, and that to the extent individual issues arise they can be resolved with minimal effort.  The second half of the Rule 23(b)(3) inquiry requires the Court to determine whether class treatment is "superior" to an individual treatment of Plaintiffs' claims.  This requires consideration of the four factors of Rule 23(b)(3).  *See Zinser*, 253 F.3d at 1190.  They are: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3).  Looking at these factors requires the Court to "focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis.'" *Zinser*, 253 F.3d at 1190 (internal quotations and citations omitted).

The first three of the superiority factors don't weigh heavily on either side of class certification in this case.  The fourth factor, which concerns the difficulties in managing a class action, is a close cousin of the predominance requirement.  When this is the case, the predominance analysis can almost double as the superiority analysis.  *See, e.g.*, *Dalton*, 2010 WL 2985130 at *9 (finding class action to be superior, at least in part, because "common issues predominate and it would be far more efficient to resolve the question of employment status on a class-wide, rather than individual, basis").  "If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not superior." *Zinser*, 253 F.3d at 1192.

//

1   The Court has already determined that the threshold question whether DTG's

2   healthcare professionals are employees or independent contractors is susceptible to

3   common proof, and that the specific claims can be adjudicated with minimal attention to

4   individual issues.  The bases for that determination also compel the conclusion that certain

5   of Plaintiffs' claims are best adjudicated on a class-wide basis.  The relatively large size of

6   the putative class in this case, along with small differences that go into adjudicating the

7   individual class members' overtime and waiting time claims, does not defeat superiority.  It's

8   certainly true that each class members claim may be large enough to pursue individually, but

9   that doesn't change the Court's view; there are still judicial resources to be conserved and

10  efficiencies to be gained in a single adjudication.

11  **VI.    Conclusion**

12      The Court **GRANTS** Plaintiffs' motion for class certification and **DENIES** DTG's

13  motion to deny class certification, but only in part.  The overtime, wage statement, and

14  waiting time claims are suitable for class-wide treatment, but the meal and rest break and

15  reimbursement claims aren't.  The Court adopts Plaintiffs' class definition and **DEFINES** the

16  class as follows:

17      All persons who currently work or have worked in California for
18      Defendant(s) as healthcare workers from March 10, 2005 to the
        present, and are/were classified as independent contractors by
19      Defendant(s)

20  (Compl. ¶ 29.)  The Court reiterates, though, that it can always revisit its decision to certify

21  a class.  If it becomes apparent that Plaintiffs claims cannot be adjudicated on a class-wide

22  basis, it will not hesitate to do so.  It doesn't certify a class lightly.  The Court well

23  understands that the decision can force a defendant to settle a case it does not believe is

    meritorious, simply because the costs of litigating are so high.

24      The named Plaintiffs, Norris-Wilson and Papa, will serve as the class representatives.

25  The Court also believes that the law firm of Nichols Kaster can litigate this case competently,

26  and it **APPOINTS** Rebekah Bailey, Michele Fisher, and Paul Lukas lead counsel.  The

27  parties should jointly submit a proposed notice within 14 days of the date this order is

28  //

entered.  If the parties can't agree on a proposed notice, the parties should each submit their own, with a very short accompanying brief, within 21 days.

DTG's summary judgment motion is **DENIED** without prejudice.  The parties must jointly submit a proposal on scheduling summary judgment motions within 7 days of the date this order is entered.

**IT IS SO ORDERED**.

DATED:  September 29, 2010

**HONORABLE LARRY ALAN BURNS**
United States District Judge

09CV0916